## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

**Committee to Save the**
**Derry Rail Trail Tunnel and**
**Rails to Trails Conservancy**

    v.                                    Case No. 24-cv-00262-PB
                                          Opinion No. 2025 DNH 078
**Shailen Bhatt, et al.**


## MEMORANDUM AND ORDER

This case lies at the intersection of highway development and historic preservation. At issue is the Federal Highway Administration's (FHWA) approval of a new six-lane road in Derry that will cut through a segment of the Manchester and Lawrence Railroad Historic District ("the Historic District"), a resource protected by § 4(f) of the Department of Transportation Act.

In 2020, the New Hampshire Department of Transportation (NHDOT) proposed a design for the new road that included an underpass ("the Underpass Alternative") to allow people walking and bicycling along the rail corridor to pass beneath the new road. But in 2024, transportation officials abandoned the Underpass Alternative and instead opted for a less costly design featuring two different ways for users to cross the new road: one that diverges from the Historic District and follows a grade-separated path under

a nearby bridge and another that largely remains within the Historic District but rises approximately ten feet to an at-grade signalized crosswalk on the new road before descending back to the existing grade of the railroad bed ("the At-Grade Alternative").

The plaintiffs are two rail trail advocacy groups that are challenging the FHWA's decision to abandon the Underpass Alternative in favor of the At-Grade Alternative. The plaintiffs' principal argument is that defendants made this determination without complying with their obligation under § 4(f) and its implementing regulations to compare both proposals and choose the one that causes the least overall harm to the Historic District. They seek an injunction to prevent construction activities that could affect the Historic District until the defendants comply with their obligations under § 4(f).

## I.    BACKGROUND

To understand this case, it is helpful to know something about the requirements that § 4(f) places on federally funded-transportation projects. Accordingly, I begin by discussing § 4(f) before turning to a description of the Historic District and how it will be affected by the new road.

### A.    Legal Framework

#### 1.    Section 4(f)

Congress enacted § 4(f) of the Department of Transportation Act of 1966 to protect significant public resources, such as parks, recreation areas,

wildlife and waterfowl refuges, and historic sites. 49 U.S.C. § 303; see also

Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 412-13 (1971).

Among these public resources, § 4(f) protects both historic sites listed on the

National Register of Historic Places and those deemed eligible for listing by

the relevant state historic preservation office. See 23 C.F.R. § 774.17.

Section 4(f) places both substantive and procedural limitations on the

U.S. Secretary of Transportation's ability to authorize the use of federal

funds for a project that affects a site protected by the statute. The

Secretary—or his designee[1]—may approve funding for projects affecting § 4(f)

protected land only when particular conditions are met. See 49 U.S.C. § 303

and 23 U.S.C. § 138.[2]

---

[1]    Section 4(f) places requirements on the Secretary of Transportation. In
many instances, including this one, the Secretary designates an official under
his authority to shepherd a project through the § 4(f) process. In this case, the
Federal Highway Administrator Shaileen Bhatt—since replaced by Acting
Administrator Kristin White—handled the § 4(f) approval process. For the
sake of clarity and consistency with broader § 4(f) case law, I continue to
describe the legal requirements and actions taken with reference to the
"Secretary" rather than the administrator.

[2]    The requirements of § 4(f) are codified in two places: first, as part of the
Department of Transportation Act of 1966 at 49 U.S.C. § 303 and, second, in
the Federal-Aid Highway Act of 1968 at 23 U.S.C. § 138. The parties, statute,
and case law still refer to this provision as § 4(f). Accordingly, I do the same.

As an initial matter, the Secretary must consider whether there is a "prudent and feasible alternative to using" the protected land under § 4(f)(1).[3] 49 U.S.C. § 303(c)(1); 23 U.S.C. § 138(a)(3)(A). If a prudent and feasible alternative exists that avoids use of the § 4(f) protected land altogether, the Secretary may not approve a plan that would use it. In other words, "§ 4(f) requires a thumb on the scale in favor of alternatives that avoid the use of § 4(f) lands." Conservation All. of St. Lucie Cnty., Inc. v. U.S. Dep't of Transp., 847 F.3d 1309, 1327 (11th Cir. 2017).

If the Secretary determines there is no prudent and feasible alternative that would avoid use of the § 4(f) protected property altogether, the Secretary must then meet the requirements of § 4(f)(2) before approving a project: He must take steps to ensure that the proposed "project includes all possible planning to minimize harm" to the protected resource. 49 U.S.C. § 303(c)(2); 23 U.S.C. § 138(a)(3)(B).

Several circuits have considered what "all possible planning to minimize harm" entails and have concluded that this statutory hurdle is not merely procedural but substantive as well. In situations where the Secretary is considering several alternative proposals—all of which use the § 4(f)

---

[3]     Though not relevant for purposes of this order, the statute does contain a safe harbor for projects that result in only de minimis impacts to § 4(f) resources.

property in some way—these courts have held that the Secretary must first compare the alternatives and select the one that causes the least overall harm to the § 4(f) property.[4] See Louisiana Env't Soc'y, Inc. v. Coleman, 537 F.2d 79, 86 (5th Cir. 1976). Courts have emphasized over the years that "all possible planning to minimize harm" involves a qualitative comparison of harms and have reviewed the Secretary's decisions accordingly. See Coal. on Sensible Transp., Inc. v. Dole, 826 F.2d 60, 65-66 (D.C. Cir. 1987); see also Geer v. Fed. Highway Admin., 975 F. Supp. 47, 74-77 (D. Mass. 1997) (finding least overall harm analysis adequate); but see Merritt Parkway Conservancy v. Mineta, 424 F. Supp. 2d 396, 416-24 (D. Conn. 2006) (finding the alternatives not adequately analyzed). The least overall harm analysis itself is "a simple balancing process which totals the harm caused by each alternate route to section 4(f) areas and selects the option which does the least harm." Druid Hills Civic Ass'n, Inc. v. Fed. Highway Admin., 772 F.2d 700, 716 (11th Cir. 1985). When conducting this analysis, the Secretary must consider the "quantum of harm" to the § 4(f) property caused by each alternative. Id. To determine that "quantum," the agency must take a holistic approach. Id. The Secretary should then choose the

---

[4]    Subsections (1) and (2) of § 4(f), codified at 49 U.S.C. §§ 303(c)(1)-(2), require distinct considerations. What might render one alternative imprudent under subsection (1) may not necessarily be relevant when evaluating harm minimization under subsection (2).

alternative that minimizes harm—or causes the "least harm" (assuming it is also feasible and prudent). Id. If the Secretary determines that multiple alternatives result in substantially equal harm, he is free to choose among those alternatives. See Louisiana Env't Soc'y, Inc., 537 F.2d at 86.

In order to ensure adequate compliance with the "all possible planning to minimize harm" requirement, the Secretary of Transportation promulgated regulations that delineate the contours of the harm minimization and mitigation analysis. See 23 C.F.R. § 774.3(c); see also 73 Fed. Reg. 13370 (Mar. 12, 2008) (explaining that the requirements in the regulations are drawn largely from existing case law). These regulations lay out two limitations on the Secretary's ability to approve a proposal that impacts § 4(f) property. See 23 C.F.R. § 774.3(c)(1)-(2).

First, the Secretary may select "only the alternative that causes the least overall harm in light of the statute's preservation purpose." Id. at § 774.3(c)(1) (emphasis added) (cleaned up). To guide the analysis, the regulations list seven factors the Secretary should take into account when fulfilling his substantive obligation under § 4(f)(2): (i) the ability to mitigate adverse impacts to the historic site; (ii) the relative severity of the remaining harm, after mitigation, to the protected activities, attributes, or features that qualify the historic site for protection; (iii) the relative significance of the historic site; (iv) the views of the official(s) with jurisdiction over the historic

site; (v) the degree to which each alternative meets the purpose and need for the proposed project; (vi) after reasonable mitigation, the magnitude of any adverse impacts to resources not protected by § 4(f); and (vii) substantial differences in costs among the alternatives. Id.

Second, once the Secretary has selected the alternative that causes the least overall harm, the regulations further specify that the Secretary must engage in "all possible planning, as defined in 23 C.F.R. § 774.17" to ensure that that the agency minimizes harm in the context of that chosen alternative. Section 774.17 defines "all possible planning" at this second stage to mean "all reasonable measures identified in the Section 4(f) evaluation to minimize harm or mitigate for adverse impacts and effects[.]" Id. § 774.17.

"With regard to historic sites, the measures normally serve to preserve the historic activities, features, or attributes of the site as agreed by the Administration and the official(s) with jurisdiction over the Section 4(f) resource in accordance with the consultation process[.]" Id. When making this determination, the Secretary must consider the views of officials with jurisdiction over the property, whether the cost of the measures is a "reasonable public expenditure," and any impacts or benefits of the measures to communities or environmental resources outside the protected site. See id.

While some of these factors overlap with those of the "least overall harm" analysis described above, they are independent and distinct. See 73

7

Fed. Reg. 13373 (explaining the relationship between factors listed in §§

774.3(c)(1) and 774.17). Where the least overall harm analysis focuses on

comparing alternative proposals, each of which affect the § 4(f) property, the

"all possible planning" requirement of § 774.17 focuses on mitigation of harm

once the chosen alternative is selected. See id.

     In a typical § 4(f) case, the Secretary must comply with a host of

documentation and consultation requirements in the regulations. See 23

C.F.R. §§ 774.5, 774.7, 774.9. However, the federal regulations also permit

the Secretary to engage in "Programmatic Section 4(f) evaluations," which

are "a time-saving procedural alternative to preparing individual Section 4(f)

evaluations[.]" Id. at § 774.3(d) (emphasis added). Over the years, several

agencies within the Department of Transportation have adopted

programmatic evaluations to allow for an abbreviated § 4(f) review. In 2005,

the FHWA introduced the "Section 4(f) Net Benefit Programmatic

Evaluation." See 70 Fed. Reg. 20618 (Apr. 20, 2005). This programmatic

evaluation purports to streamline the FHWA's internal review process and is

applicable only where a proposed transportation project results in a "net

benefit" to the § 4(f) property. Id. To be eligible for the § 4(f) Net Benefit

Programmatic Evaluation, the proposed project must result in an

improvement to the § 4(f) property when compared to the "no build" status

quo.

Per FHWA guidance, the § 4(f) Net Benefit Programmatic Evaluation relieves the agency of several documentation, coordination, and timing requirements. See id.; see also 23 C.F.R. §§ 774.5, 774.7, 774.9. Importantly, the § 4(f) Net Benefit Programmatic Evaluation does not exempt the Secretary from the statutory requirement to engage in "all possible planning to minimize harm." The programmatic evaluation is about "reduc[ing] the processing time and effort necessary to document the analysis and illustrate that the Section 4(f) requirements have been met." 70 Fed. Reg. 201619. It does not change or lessen the requirements of § 4(f).

If there were any doubt on this point, an FHWA notice describing the § 4(f) Net Benefit Programmatic Evaluation is clear: "[T]his programmatic evaluation is not a waiver or relaxation of any of the Section 4(f) standards or judicial interpretations of the legislative requirements." 70 Fed. Reg. 20621 (emphasis added). Section 4(f) Net Benefit Programmatic Evaluations may only be used where "the proposed action includes all possible planning to minimize harm [and] includes appropriate mitigation measures[.]" Id. at 20630.[5]

---

[5]     Though this FHWA administrative notice is not afforded the force of law, I find that its position on the effect of programmatic evaluations on § 4(f)'s substantive requirements is persuasive.

In order for the Secretary and applicants seeking funding for a project to take advantage of the § 4(f) Net Benefit Programmatic Evaluation's streamlined process, all the relevant officials with jurisdiction must agree in writing that the proposed project results in a net benefit to the § 4(f) property and that the project includes both harm minimization and mitigation measures. Id. at 20629. In addition, they must document the basis for their conclusion that the project does so. Id. at 20630 ("This programmatic evaluation approval applies only after the Administration has [. . . d]ocumented the information that clearly identifies the basis for all [programmatic evaluation eligibility] determinations[.]"); see also 23 C.F.R. 774.3(d).[6]

    2.    National Historic Preservation Act

Section 4(f) is not the only law the federal government must comply with when it funds or undertakes a project that affects a historic site. Section 106 of the National Historic Preservation Act (NHPA) requires that officials with jurisdiction over a federally funded project, including the heads of the relevant federal and state agencies, "take into account the effect of an undertaking on any historic property." See 54 U.S.C. § 306108. The NHPA

---

[6]    When the FHWA undertakes a complete individualized § 4(f) review, it must document its compliance with the § 4(f) standard in accordance with 23 C.F.R. § 774.7. The § 4(f) Net Benefit Programmatic Evaluation documentation requirement is set fourth at 70 Fed. Reg. 20630.

governs both properties listed on the National Register of Historic Places and those eligible for listing. See 36 C.F.R. § 800.4(c).

Section 106 of the NHPA requires that federal and state authorities assess the adverse effects of a proposed project on the historic property, see id. § 800.5, and document the findings of that assessment, see id. §800.11. This obligation is independent of the federal agency's § 4(f) compliance obligations and requires consideration of different factors.

    3.    <u>National Environmental Policy Act</u>

Certain federally funded projects must also run the procedural gauntlet of the National Environmental Policy Act (NEPA). See 42 U.S.C. §§ 4321-4347 (1969). NEPA requires that the relevant federal agency issue an environmental impact statement (EIS) for proposed actions that have a "reasonably foreseeable significant effect on the quality of the human environment." Id. § 4336(b)(1). In order to proceed with a project, the federal agency must issue a record of decision (ROD) explaining the agency's decision to proceed. See 23 C.F.R. §§ 771.124, 771.127. In the event the agency makes a change to a project after it has already gone through the NEPA process and issued a final EIS/ROD, the agency must determine whether the existing approved EIS/ROD remains valid. See id. § 771.129. The agency can do so by completing a "re-evaluation." That re-evaluation will determine whether the

agency must draft a supplement to the existing EIS or draft an entirely new one in light of the proposed change to the previously approved project. Id.

When a federal agency undertakes a project, it can document its compliance with NEPA, § 106 of the NHPA, and § 4(f) all in the same place,[7] but each statutory provision represents a separate obligation involving different procedural—and sometimes substantive—components.

**B.    The Manchester and Larence Railroad Historic District**

1.    The Railroad

The Historic District is a twenty-two-mile corridor that follows the historic route of the railroad between Manchester and the state line near Salem, New Hampshire. Doc. 1 at 6. Chartered in 1847 and added to the Boston and Maine Railroad network in 1887, the Manchester and Lawrence Railroad ("M&L Railroad") was an important transportation artery in nineteenth and early twentieth century New England. Id. at 7. The railroad was an engineering feat in its day—the work of Irish laborers who cut through New Hampshire's granite hillsides with hand tools and blasting powder. Id. The M&L Railroad served the needs of the towns through which it passed, linking two of the region's biggest industries—Hood & Sons milk

---

[7]    Both the § 4(f) documentation and the § 106 documentation are typically contained within an EIS or Finding of No Significant Impact (FONSI), prepared in compliance with NEPA. See 23 C.F.R. § 771.133.

and Annis Grain and Lumber Company—with the wider world. Id. at 9. By the 1930s, however, passenger service had dwindled, and in 1953 the train carried its last passenger. Id. at 10. Throughout the 1980s and 1990s, the line was slowly dismantled and eventually went to seed. Id.

In 2009, the New Hampshire Division of Historical Resources (NHDHR) determined that the portion of the railroad corridor in New Hampshire was eligible for inclusion on the National Register of Historic Places, a status that protects the property from potentially harmful transportation projects pursuant to § 4(f). Id. In making this determination, NHDHR acknowledged the railroad's "significant contribution to the history and development of the five New Hampshire communities that it passed through" and noted that the "rail line connected the residents of the small communities with larger cities and provided a critical and convenient transportation route for local agricultural products and manufactured goods, passengers and mail."[8] Doc. 1-1 at 28. The NHDHR eligibility determination also recognized that the Historic District "retains some integrity of materials, design, workmanship, feeling, setting and association" in part because

---

[8]    While the full NHDHR determination of eligibility is not in the administrative record, plaintiffs attach it to their complaint as an exhibit. See Doc. 1-1. Defendants do not object to my taking judicial notice of the document, and I do so here.

13

"overall [. . .] the right-of-way is still generally recognizable as a contiguous transportation corridor." Id.

###### 2. The Derry Rail Trail

Whereas the Historic District is a product of nineteenth-century engineering, the Derry Rail Trail is a creature of twenty-first century recreation. Local authorities in Derry and Londonderry have developed portions of the historic corridor into a paved path for pedestrians and cyclists, with plans to connect it with a larger network of New Hampshire rail trails stretching from the Connecticut River to the Massachusetts state line. Doc. 1 at 11-12. The rail trail currently ends approximately 1,860 feet south of the proposed highway development site. Admin. Rec. at 0016092.

It bears noting that while the Derry Rail Trail follows the Historic District's path, it is not itself a § 4(f) property. Doc. 1 at 11-13. Furthermore, the segment of the Derry Rail Trail at issue here remains unconstructed—it exists merely as a planned northward extension of the trail from its current terminus. Id. The towns of Derry and Londonderry intend to complete this section of the rail trail after the highway project is finished. Id.

#### C. **The New Road**

NHDOT is building a 3.2-mile road connecting a new I-93 Exit 4A interchange with the town of Derry. The purpose of the Exit 4A project is "to reduce congestion and improve safety along State Route 102 [. . .] from I-93

easterly through downtown Derry, and to promote economic vitality in the Derry/Londonderry area." Admin. Rec. at 0016034. The project will consist of approximately one mile of new road and 2.2 miles of reconstructed roads. Id. Most significantly for our purposes, the new road will cut across the Historic District at an elevation approximately ten feet above the existing grade. Doc. 1 at 18.

### 1.    The Underpass Alternative

In moving forward with the Exit 4A project, the agencies opted to conduct a § 4(f) Net Benefit Programmatic Evaluation—rather than a standard § 4(f) evaluation—in order to streamline the process and reduce paperwork. See 70 Fed. Reg. 20618. This approach required two things: (1) written agreement of all the officials with jurisdiction over the Historic District that the proposed project results in a net benefit to the Historic District and includes both harm minimization and mitigation measures, and (2) documentation of the basis for their conclusion that the project does so. See id.

The required agreement was memorialized in an Adverse Effect Memo dated August 13, 2019. Admin. Rec. 0005182 ("NHDHR and NHDOT agree with FHWA's finding that this undertaking is a Net Benefit to the M&L Railroad Historic District under Section 4(f) due to its measures to minimize harm to the historic district by allowing the continuity of the M&L Railroad,

even if off-alignment."). To meet the documentation requirement, the agencies included a "Programmatic Net Benefit Section 4(f) Evaluation" in the Final Environmental Impact Statement and Record of Decision (FEIS/ROD) for the Exit 4A project, issued on February 3, 2020. Admin. Rec. at 0016037-48. The FEIS/ROD evaluates multiple alternatives, concludes that no "prudent and feasible alternative to using the rail corridor" exists, and identifies a single "preferred" alternative. Id. at 0016034, 0016039. It also outlines a set of "mitigation measures" designed to minimize harm within that alternative. Id. at 0016039.

One proposed "mitigation measure" for the Historic District would involve the construction of an "underpass and 900-foot paved path" which would "enable trail construction to the north as part of a separate project by others, which in turn will help protect more of the historic district from other development." Id.; see also App. A, Exh. 1. The FEIS/ROD identifies the underpass as one way in which the "preferred" alternative will mitigate harm to the § 4(f) property, stating that "the [Historic District] would be further enhanced by the construction of a suitably designed underpass that is complementary to the historic rail corridor" and would "preserve and enhance the historic features and values of the rail corridor resulting in a net benefit use." Id. at 0016435.

This "Underpass Alternative"[9] was included in the final bid process in September 2020. However, when the lowest bid for the Exit 4A project came in $30 million over budget, the project was paused, see id. at 0011749, and NHDOT shifted to a design-bid-build process, indicating they would consider "design modifications that would enhance safety and operations, as well as potentially reducing construction costs." Id. at 0028792; Doc. 37-1 at 7.

2.    The At-Grade Alternative

The first public indication that NHDOT had changed course with respect to the Underpass Alternative came on April 8, 2021, during a Cultural Resource Agency Coordination Meeting. Admin. Rec. at 0028808. At the meeting, NHDOT proposed eliminating the underpass and replacing it with a winding path that changed elevations, departed approximately 245 feet from the Historic District, and crossed the new road beneath a bridge over the nearby Shields Brook. Id.

Prior to that meeting, NHDOT had disclosed the proposed redesign to NHDHR representative Laura Black in an email on April 5, 2021. Id. at 0011386. Black expressed concern the next day that the new design took the trail out of the Historic District altogether. Id. at 0011385. She noted that the

---

[9]    Use of the term Underpass Alternative in this memorandum and order refers to both the tunnel and 900-foot path which were proposed as mitigation measures in the FEIS/ROD.

Underpass Alternative had involved "a minor shift [of the trail] to the east. It wasn't so much of a shift that trains couldn't still travel the alignment, or at the very least less observant trail users might not even realize they were off the historic corridor." Id. at 0011385.

During the April 8, 2021, Cultural Resources meeting, Black publicly expressed her concerns to NHDOT "that the [Shields Brook] path deviated too far from the historic feel of the rail corridor (flat and straight)." Id. at 0028808. In response, NHDOT added an additional route to the proposed design that remained largely within the Historic District but rose approximately ten feet and crossed the six-lane road via a signalized crosswalk before descending back to the elevation of the railroad bed.[10] See App. A, Exh. 2, 3, 4.

On September 22, 2022, NHDOT presented this updated two-route design at a Public Informational Meeting. Admin. Rec. at 0021089. At the meeting, NHDOT estimated the cost savings of eliminating the underpass at $770,000—approximately 2.3 percent of the projected $33 million total cost for the one-mile segment of the project affecting the Historic District. See Doc. 23-6 at 43; Admin. Rec. at 0020497.

---

[10]    For the sake of clarity, all references to the "At-Grade Alternative" in this order encompass the design approved in 2024, which includes both the winding route via Shields Brook as well as the at-grade signalized crossing over Folsom Road.

Roughly a month after the public meeting, Alex Bernhard, a member of Friends of the Northern Rail Trail, complained to NHDOT that the proposed at-grade crossing involved an elevation change incommensurate with the "visual elements that define a railroad [. . .] small grades and uninterrupted linearity." Admin. Rec. at 0004484-85. During a second public meeting on January 18, 2024, Bernhard raised the issue again and "asked for the effect memo to include discussion of slope impacts, noting that no railroad would go up the proposed slopes" of the new at-grade path. Id. at 0002569-70; see also App. A, Exh. 4.

NHDOT responded to Bernhard's letter on February 29, 2024, noting that "[w]hile the at-grade crossing does change the existing elevation and grade" of the railroad right-of-way and "the open view of the linear railroad corridor is temporarily interrupted," the At-Grade Alternative was "the most prudent and feasible alternative to recreate the linear corridor." Admin. Rec. at 0027294.

### 3.  Approval of the At-Grade Alternative

Having determined that the At-Grade Alternative, like the Underpass Alternative, would result in a "net benefit" to the Historic District compared to the "no build" alternative, the Secretary once again proceeded with a § 4(f) Net Benefit Programmatic Evaluation pursuant to 23 C.F.R. § 774.3(d) and related FHWA guidance. See 70 Fed. Reg. 20618; Admin. Rec. at 0028809-11.

As required by this process, the agencies were obligated to (1) obtain written agreement from all the officials with jurisdiction over the Historic District that the project results in a net benefit to the Historic District and includes harm minimization and mitigation measures, and (2) document the basis for that conclusion. See 70 Fed. Reg. 20618.

To satisfy these requirements, FHWA, NHDOT, and NHDHR executed a written agreement letter on May 13, 2024 ("the Agreement Letter"), which identified the proposed measures to minimize and mitigate harm to the Historic District. Admin. Rec. at 0028951-54. That same day, the Secretary issued a Written NEPA Re-Evaluation ("NEPA Re-Evaluation") for the Derry Rail Trail/Shields Brook Crossing site, which also purports to fulfill the programmatic evaluation's documentation requirement. Id. at 0028788-937. A section of the NEPA Re-Evaluation titled "Section 4(f) Net Benefit Re-Evaluation" concludes that the At-Grade Alternative incorporates "all appropriate measures to minimize harm and subsequent mitigation necessary to preserve and enhance those features and values of the property that originally qualified [it] for Section 4(f) protection." Id. at 0028809. In support of this conclusion, the agencies also relied on two documents incorporated into the NEPA Re-Evaluation: a March 20, 2024, Amended Adverse Effect Memo, see id. at 0028876, and an Updated Memorandum of Agreement developed through the Section 106 process, see id. at 0028882,

both of which set forth the mitigation measures associated with the At-Grade Alternative.

Because the NEPA Re-Evaluation found that the At-Grade Alternative did not result in substantially different adverse impacts from those previously assessed, the Secretary determined that the original FEIS/ROD remained valid and that a supplemental EIS was not necessary. Id. at 0028817. Later that month, the Secretary formally approved the At-Grade Alternative, and construction was set to proceed. Id. at 0028809.

## C.    **Procedural Background**

Plaintiffs commenced this action on August 26, 2024. Doc. 1. Their principal argument is that the defendants violated § 4(f) by abandoning the Underpass Alternative in favor of the At-Grade Alternative without first determining which alternative "causes the least overall harm" to the Historic District.

On October 8, 2024, plaintiffs moved for a preliminary injunction to halt construction at the Folsom Road crossing pending resolution of the lawsuit. See Doc. 20. Following a status conference on November 25, 2024, the plaintiffs agreed to drop their motion for a preliminary injunction based on the defendants' assurances that there was no planned construction in the immediate proximity of the Historic District that would preclude completion of the Underpass Alternative. See Doc. 32. The defendants indicated that

construction on the relevant portion of the new road would not begin until August 2025.

The parties subsequently filed cross-motions for summary judgment on March 20, 2025, with objections and replies completed in April 2025. A hearing on the summary judgement motions was held on May 21, 2025, and the matter is now properly before me for adjudication.

## II.    STANDARD OF REVIEW

Summary judgment is warranted when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This standard was developed to provide parties with a way to avoid the delay, expense, and uncertainty of a trial when material facts are not in dispute. Because a court may not engage in fact finding when it decides a summary judgment motion, ambiguous evidence, even if it is undisputed, ordinarily must be construed in favor of the nonmoving party. See Estrada v. Rhode Island, 594 F.3d 56, 62 (1st Cir. 2010).

In administrative law cases, however, "[t]his rubric has a special twist." Associated Fisheries of Me., Inc. v. Daley, 127 F.3d 104, 109 (1st Cir. 1997). Here, the plaintiffs challenge administrative agency action and seek judicial review pursuant to Section 706 of the Administrative Procedure Act. 15 U.S.C. § 706. In such cases, the district court reviews an agency action on the

basis of an administrative record and does not act as an independent factfinder. Associated Fisheries of Me., Inc., 127 F.3d at 109. In undertaking this review, an agency's factual findings are entitled to deference, regardless of which party has moved for summary judgment. In other words, the usual rules that describe how the court must construe the summary judgment record do not apply. See Innovator Enters., Inc. v. Jones, 28 F. Supp.3d 14, 20 (D.D.C. 2014) ("[T]he standard set forth in Rule 56(a) does not apply because of the limited role of a court in reviewing the administrative record.").

Instead, "[t]he entire case on review is a question of law." Am. Bioscience, Inc. v. Thompson, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (internal quotation omitted); see also Univ. Med. Ctr. of S. Nev. v. Shalala, 173 F.3d 438, 440 n. 3 (D.C. Cir. 1999). Accordingly, the court should rely on the administrative record and not "some new record made initially for the reviewing court." Camp v. Pitts, 411 U.S. 138, 142 (1973).

Under the APA, an agency decision made pursuant to § 4(f) will not be overturned unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A); Conservation L. Found. v. Fed. Highway Admin., 24 F.3d 1465, 1471 (1st Cir. 1994). The Supreme Court's decision in Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402 (1971), provides the controlling framework for judicial review of § 4(f) determinations. Id. at 412-13. While the Secretary's decisions are

afforded a presumption of regularity, this does not insulate them from a "thorough, probing, in-depth review." Id. at 415.

The "highly deferential abuse of discretion standard of review," Conservation L. Found., 24 F.3d at 1471, requires that I determine whether the agency examined the relevant evidence, considered the appropriate factors, and articulated a rational connection between the facts found and the decision made. Airport Impact Relief, Inc. v. Wykle, 192 F.3d 197, 202 (1st Cir. 1999). I may not substitute my judgment for that of the Secretary of Transportation, but I must still undertake a careful review of the record to ensure that the Secretary's action reflects a reasoned evaluation. Hist. Bridge Found. v. Buttigieg, 22 F.4th 275, 282 (1st Cir. 2022). And, in resolving pure questions of law, the APA provides that it is "'the reviewing court' not the agency that 'shall decide all relevant questions of law'." Mayburg v. Sec'y of Health & Hum. Servs., 740 F.2d 100, 145 (1st Cir. 1984) (citing §706).

In effect, the district court sits as an appellate tribunal tasked with deciding whether the agency could have reasonably drawn the conclusions it did. See Uddin v. Mayorkas, 862 F. Supp. 2d 391, 400 (E.D. Pa. 2012). I must ask "whether the agency relied on factors outside those Congress intended for consideration, completely failed to consider an important aspect of the problem, or provided an explanation that is contrary to, or implausible in

light of, the evidence." NVE, Inc. v. Dep't of Health & Hum. Servs., 436 F.3d

182 (3d Cir. 2006).

### III.    ANALYSIS

This case turns on a single issue: Did the defendants conduct the "least

overall harm" analysis required by 23 C.F.R. § 774.3(c)(1) before they

abandoned the Underpass Alternative in favor of the At-Grade Alternative?

The plaintiffs argue that the two alternatives mitigate harm to the Historic

District in significantly different ways. The Underpass Alternative calls for

"gentle slopes, isolation from traffic, and a direct connection between

adjoining segments" that will "preserve the 'feeling, setting and association'

of the former railroad and will ensure that it remains 'recognizable as a

contiguous transportation corridor.'" Doc. 38-1 at 16-17 (quoting 36 C.F.R. §

60.4 and NHDHR Eligibility Determination). In contrast, the At-Grade

Alternative requires users of the rail corridor to either depart substantially

from the Historic District and pass under the road at a nearby bridge or

climb "a steep grade of up to 10 feet of earthwork" and cross the new road at

a signalized crossing. Id. Because the defendants never compared these

alternatives in a least overall harm analysis, plaintiffs argue, they cannot

proceed with their plan to build the At-Grade Alternative.

Defendants concede that they were required to compare the At-Grade

and Underpass Alternatives in a least overall harm analysis. See, e.g., Doc.

43 at 13 ("the Secretary must document his analysis of which alternative causes the least overall harm"); Doc. 37-1 at 23 ("FHWA properly conducted the balancing test required by 23 C.F.R. § 774.3(c)(1)."). They argue, however, that a fair reading of the administrative record supports their contention that they conducted the required analysis. I am not persuaded by the defendants' argument.

Defendants do not identify any document, or any part of a document, in the administrative record that is denominated as a least overall harm analysis. Nor do they point to anything in the record that reasonably can be read as an attempt to assess the Underpass and At-Grade Alternatives using the seven-factor test for a least overall harm analysis called for by 23 C.F.R. § 774.3(c)(1). Instead, they rely on several isolated statements in the NEPA Re-Evaluation and a handful of other documents to support their contention that the defendants must have conducted a least overall harm analysis because they understood the differences between the two alternatives. But nothing in the administrative record supports the defendants' argument.

Defendants prepared the NEPA Re-Evaluation primarily to permit FHWA to determine whether NHDOT's proposal to replace the Underpass Alternative with the At-Grade Alternative required the preparation of a supplemental EIS. Admin Rec. at 0028791. Accordingly, it begins with a "Comparison of the Selected Alternative and the Proposed Alternative" that

highlights several benefits of the At-Grade Alternative, including a statement that it would be "less costly to construct and maintain" than the Underpass Alternative.[11] Id at 0028793. However, this section does not mention § 4(f) or otherwise attempt to determine which alternative does the least harm to the Historic District. Instead, defendants address § 4(f) in a different section of the NEPA Re-Evaluation captioned "Section 4(f) Re-Evaluation." Id. at 0028808-11. Although this section states, that "project elements of the [At-Grade Alternative] for accommodation of the future extension of the Rail Trail by others differ relative to the [Underpass Alternative]," it does not even attempt to evaluate the comparative harm that each alternative will cause to the Historic District. Id. Further, although it references several mitigation measures that will be included with the At-Grade Alternative, it omits any discussion of the Underpass Alternative. Id. This omission is

---

[11]    The only comparative statement in the record that concerns one of the least overall harm analysis's seven factors, see 23 C.F.R. 774.3(c)(1)(vii), is the comparison of cost between the two proposals. The Secretary may consider "[s]ubstantial differences in costs among the alternatives." Id. Here, the estimated cost savings of eliminating the underpass were $770,000— approximately 2.3 percent of the projected $33 million cost for a one-mile segment of the larger Exit 4A project. See Doc. 23-6 at 43; Admin. Rec. at 0020497. Courts have set a high bar for substantiality. See Stop H-3 Ass'n v. Dole, 740 F.2d 1442, 1452 (9th Cir. 1984), cert. denied, 471 U.S. 1108 (1985) (rejecting arguments that costs as high as $42 million—10 percent of the total project budget—justified rejecting a preservation alternative). Although defendants clearly understood that the At-Grade Alternative would be less costly than the Underpass Alternative, the record is devoid of any indication that the defendants concluded that this cost differential was "substantial."

telling given that the underpass was touted as a mitigation measure in the FEIS/ROD. Thus, the NEPA Re-Evaluation cannot serve as a least overall harm analysis of the Underpass and At-Grade Alternatives.

Defendants also rely on the Agreement Letter in which FHWA, NHDOT, and NHDHR concurred that "the final mitigation measures of the Updated Memorandum of Agreement executed on May 7, 2024 satisfy the requirements of Section 4(f)." Id. at 0027243-46. But this document does not suggest in any way that the defendants compared the At-Grade and Underpass Alternatives in a least overall harm analysis. Although this letter refers to both the At-Grade Alternative and the Underpass Alternative, it does so only to demonstrate that both alternatives achieve a net benefit to the Historic District in a similar way. Id. at 00277243-44. What it does not do is evaluate the At-Grade and Underpass alternatives to determine which causes the least overall harm to the Historic District. Id.

Although defendants also cite isolated statements in the Amended Adverse Effect Memo, id. at 0028958, and the Updated Memorandum of Agreement, id. at 0028931, these documents were created to show compliance with the defendants' obligations under § 106 of the NHPA. They do not mention § 4(f) and they do not attempt to determine which of the two alternatives cause the least overall harm to the Historic District. In short, neither these documents nor any other entries in the administrative record

support the defendants' contention that they ever compared the Underpass

Alternative or the At-Grade Alternative in a least overall harm analysis

pursuant to 23 C.F.R. § 774(c)(1).

Defendants present several additional arguments in an effort to

undermine the plaintiffs' request for an injunction. None of them are

persuasive. First, the defendants complain that the plaintiffs are holding

them to too high a standard by requiring them to use "magic terminology" to

document their least overall harm analysis. Doc. 36-1 at 18. This argument

mischaracterizes the problem. As I have explained, defendants have an

obligation to document their findings when undertaking a § 4(f) Net Benefit

Programmatic Evaluation. Although magic language is not needed to satisfy

this requirement, the administrative record must contain sufficient

documentation to support a finding that the required evaluation was

conducted. See 70 Fed. Reg. 20630. In this case, there is simply no evidence

in the record that defendants ever compared the At-Grade and Underpass

Alternatives in a least overall harm analysis.

Defendants also argue that the Secretary was free to choose the At-

Grade Alternative over the Underpass Alternative because they are

substantially equal in mitigating harm to the Historic District. See Doc. 37-1

at 16-17. The problem with this argument is that it works only if defendants

reached this conclusion after undertaking the required analysis. Because

29

they did not conduct a least overall harm analysis, they are in no position to argue now that their choice of the At-Grade Alternative should be affirmed because they could have chosen it if they had conducted the proper analysis.

Defendants next remind the Court of the deference that a reviewing court must give to agency decision making. But when an agency fails to conduct analysis that the law requires, the court cannot give deference to a decision that was never made. Because the defendants never undertook a least overall harm analysis, the Court cannot defer to the Secretary's decision to approve the At-Grade Alternative.

Defendants raise one final issue that warrants discussion. On June 17, 2025, the defendants filed a pleading captioned "Federal Defendants' Notice of Supplemental Authority." Doc. 52. This filing includes a footnote in which the defendants state: "[w]hile Federal Respondents have argued that evidence in the [administrative record] provides a basis for the analysis outlined in 23 C.F.R. § 774.3(c), the programmatic Section 4(f) evaluation does not require that analysis." Id. at 4 n.1 (internal citations omitted). In making this claim, defendants have not attempted to withdraw their concession that they were required to undertake a least overall harm analysis pursuant to 23 C.F.R. § 774.3(c)(1). They have not explained why they are presenting this argument for the first time more than three months after they filed their first summary judgment briefs and more than a month after a

three-hour oral argument in which the Court discussed the § 4(f) Net Benefit Programmatic Evaluation with the parties. Nor do they cite any authority or present any developed legal argument to support their conclusory assertion.

If I were to assess the defendants' new argument now, I would have to resolve several complex legal issues without the benefit of briefing from the parties. For example, if, as it appears, 23 C.F.R. § 774.3(c)(1) was adopted to comply with § 4(f)(2), how could the FHWA exempt itself from its statutory duty to conduct a least overall harm analysis merely by adopting a programmatic evaluation that relieved the agency from a statutory obligation? Even if defendants have an easy answer to that question, how do they explain the FHWA's statements in the Federal Register when they adopted the § 4(f) Net Benefit Programmatic Evaluation that it does not relieve the FHWA of any of its substantive obligations under § 4(f)? And even if defendants are correct that they were not required to conduct a least overall harm analysis, why would they not be obligated to compare the Underpass and At-Grade Alternatives when determining that they have complied with their duty under the § 4(f) Net Benefit Programmatic Evaluation to determine that they have complied with the "mitigation and measures to minimize harm" component of the evaluation? None of these questions have ready answers.

31

The First Circuit has recognized that "a party who aspires to oppose a summary judgment motion must spell out his arguments squarely and distinctly, or else forever hold his peace. The district court is free to disregard arguments that are not adequately developed." Higgens v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 260 (1st Cir. 1999) (cleaned up). And, as the court more recently observed, "[t]his is particularly true where, as here, the undeveloped argument raises complexities that defy an easy answer." Coons v. Indus. Knife Co., 620 F.3d 38, 44 (1st Cir. 2010) (cleaned up).

Here, the defendants' new argument is flatly inconsistent with its concession that it was required to conduct a least overall harm analysis. It comes too late. And it is not accompanied by sufficient supportive legal argument to warrant consideration.

## V.    CONCLUSION

Plaintiffs are not seeking to prevent the defendants from completing their road project. They merely ask that the defendants be enjoined from proceeding until they give proper consideration to their claim that the Underpass Alternative will cause substantially less harm to the Historic District than the At-Grade Alternative. Because defendants concede that they must conduct this analysis and I determine that they have so far failed to do so, I enjoin the defendants from performing construction in the immediate proximity of the Historic District that would in any way foreclose

or substantially hinder the completion of the Underpass Alternative in the

manner originally proposed in the FEIS/ROD. Defendants may petition the

court to dissolve the injunction if they can demonstrate that they have fully

complied with their obligations under § 4(f) as explained in this

memorandum and order.

SO ORDERED.

/s/Paul Barbadoro
Paul J. Barbadoro
United States District Judge

Date: June 30, 2025

cc: Counsel of Record

**Appendix A**



*Exhibit 1: Underpass Alternative design showing the tunnel beneath Folsom Road and route of the proposed 900-foot path. Admin. Rec. at 0009708.*



*Exhibit 2: The At-Grade Alternative's two proposed routes in purple and green. The earlier Underpass Alternative route is shown in yellow. Admin. Rec. at 0028902.*



*Exhibit 3: Profile view of the At-Grade Alternative prepared by Friends of the Northern Railroad and submitted to NHDHR. Admin. Rec. at 0028920.*



*Exhibit 4: Digital rendition of the At-Grade Alternative's signalized crosswalk. Admin. Rec. at 0028918.*